IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
HELENA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>EDMUND TAYLOR MADARASSY, IV,<br><br>Defendant. | Cause No. CR 24-10-H-BMM<br><br>**ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS** |

A grand jury indicted Defendant Edmund Taylor Madarassy, IV with being a prohibited person in possession of a firearm and ammunition, in violation of 18 U.S.C. § 922(g)(1) (Doc. 1.) Madarassy filed a Motion to Suppress. (Doc. 28.) Madarrasy asserts that law enforcement unlawfully detained him; that Montana Probation & Parole ("P & P") unlawfully authorized a search of his car; and any evidence obtained resulted from an illegal search. (*Id.* at 1-2.) The Government opposes. (Doc. 39.) The Court held a hearing on September 19, 2024. (Doc. 42.)

## BACKGROUND

Helena Police Department ("HPD") officer Justin Officer Gibson ("Officer Gibson") received information on December 23, 2023, at about 6:45 AM, from a

1

man named Paul James Laverdure ("PJL). (Doc. 29 at 2.) The interaction is recorded on body cam footage. (Def. Ex. 1.) PJL reported that a car was following him around town that morning and that the driver had stopped and told him "if you come any closer, I'll shoot you." (*Id.*) The driver allegedly pulled a gun out and pointed it at PJL. (*Id.*) PJL described the gun as a silver revolver and the car as a lifted dark colored car with a lot of stuff in the back. (*Id.*) PJL described the driver as a man with a bushy beard and that he may have been homeless because of all the stuff in his car. (*Id.*) (Doc. 39-1.)

    Officer Gibson attempted to locate the car with the license plate given by PJL but was unsuccessful. (*Id.*) Officer Gibson went to the Federal Reserve Bank to obtain security camera footage of the alleged incident near the intersection of Neill and Fuller in Helena. (*Id.*) Officer Gibson reviewed the security camera footage and used his phone to record a copy. (Def. Ex. 4.) The video shows PJL walking east on Neill when a dark color Subaru that appeared to be lifted drove past him at around 6:15 AM. (*Id.*) PJL walked into the street numerous times and seemed to be swiveling his head around. (*Id.*) The video never captures the Subaru passing him again. (*Id.*)

    Another HPD officer, John Strandberg ("Strandberg"), located a car at the America's Best Hotel in Helena on December 24, 2023. (Doc. 39-1.) The license plate was identified (THX1138), and matched the description seen on the video and

described by PJL. (*Id.*) Officer Gibson went to the hotel and looked in the windows of the car and did not observe a firearm or any indication of a firearm. (*Id.*) Officer Gibson left his business card on the windshield and a note requesting a call from the owner of the car. (*Id.*)

Another officer, Nick Officer Leshinski ("Officer Leshinski"), located the car, matching the description, driving in Helena on December 29, 2023, at around 1:22 AM. (*Id.*) (Doc. 29 at 4.) Officer Leshinski had become aware of the car from Officer Gibson who shared a still photo of the car and a description on a police TEAMS chat. (*Id.*) Officer Leshinski followed the car into the Howard Johnson Hotel in Helena. Officer Leshinski testified that he did not block the car's exit. (Doc. 39-2.) The driver got out of his car and was identified as Madarassy. (*Id.*) Officer Leshinski parked behind the hotel out of sight of Madarassy and confirmed that Madarassy and Madarassy's car matched the description in Officer Gibson's report. (*Id.*) Officer Leshinski then reengaged Madarassy who had been sitting in the driver's seat of his car and asked to speak with him regarding the incident on December 23, 2023. (*Id.*)

Another Helena Police Department Officer read Madarassy his *Miranda* warnings and patted down Madarassy for weapons. Officer Leshinski started questioning Madarassy following the *Miranda* warnings. (Def. Ex. 6.) Madarassy asked if the encounter involved someone hitting something with his car. (*Id.*) Madarassy claimed he let someone borrow his car and that the borrower had hit a

3

"reflector pole" while driving it. (*Id.*)

Officer Leshinski asked Madarassy whether he had been involved in an encounter with a pedestrian earlier on December 23,2024. (*Id.*) Madarassy remembered the encounter and stated that he had driven by the pedestrian a couple times in the same block. (*Id.*) Madarassy reported that the pedestrian was throwing his hands up and screaming profanities at him, so he stopped and rolled the window down to "ask him if he needed anything." (*Id.*) Officer Leshinski asked if Madarassy pointed a gun at the pedestrian. Madarassy denied that he had pointed a gun. (*Id.*) Madarassy explained that he is not allowed to have weapons due to his P & P status. (*Id.*) Officer Leshinski asked whether Madarassy had anything similar to a "silver revolver" and Madarassy responded that he had not carried a pistol in three years, but owns a black .357 pistol and keeps it at his parent's house in Ennis, Montana. (*Id.*) Officer Leshinski requested to search Madarassy's car. Madarassy denied consent. Madarassy explained that he did not know who has been in the car and what might be found in the car. (*Id.*) Officer Leshinski directed Madarassy to "hang out with this officer one second, and [Officer Leshinski] would be right back." (*Id.*)

  Officer Leshinski walked to his patrol car and called the Helena P & P. (*Id.*) Officer Leshinski reported he was calling about a potential assault with a weapon, identified Madarassy, and informed Helena P & P that Madarassy is on supervision out of Ennis, Montana. (*Id.*) Officer Leshinski explained the report received from

PJL, including the information about a person in a car and a "silver revolver" being used in the assault. (*Id.*) The Helena P & P officer asked if Officer Leshinski intended to arrest Madarassy based on the information the HPD officers had. (*Id.*) Officer Leshinski responded that he was unsure if the gun was in the car. (*Id.*) Officer Leshinski asked the Helena P & P officer whether he should search the car. (*Id.*)

The Helena P & P officer responded that he would consent to the search given the information provided by Officer Leshinski, but was unsure about his jurisdiction, as he was "on call" for Helena and Madarassy was on supervision in another location. (*Id.*) Officer Leshinski continued to give a summary of what Madarassy had admitted to during the earlier questioning under *Miranda*. (*Id.*) Officer Leshinski informed the Helena P & P officer that Madarassy had admitted to an altercation with a pedestrian but denied having a firearm. (*Id.*) Officer Leshinski explained that there was a "pretty good" description of the firearm from the alleged victim. (*Id.*)

The Helena P & P officer gave Officer Leshinski the Bozeman and Butte "on call" P & P officer numbers as he was unsure who had jurisdiction over the Dillion, Montana area. (*Id.*) The Helena P & P officer directed Officer Leshinski to call back if no other officer gave consent to search or was unsure about jurisdiction. (*Id.*) The Helena P & P officer surmised that Madarassy's admission to the location of the gun would lead to discovery of more potential contraband in the car. (*Id.*) Officer Leshinski and Officer Baker called the Bozeman and Butte P & P offices. (*Id.*)

5

Bozeman was identified as the correct "on call" P & P office for Madarassy. The Bozeman P & P on call office gave consent to Officer Leshinski to search Madarassy's car after a brief description of the alleged crime. (*Id.*)

A grand jury indicted Madarassy for being a prohibited person in possession of a firearm and ammunition in violation of 18 U.S.C. § 922(g)(1) (Doc. 1.) Madarassy filed this motion to suppress on the basis that the Helena Police Department unlawfully detained Madarassy and conducted an unlawful search. (Doc. 29 at 1-2.) Madarassy contends the exclusionary rule requires the Court to suppress any evidence discovered after the unlawful search and seizure. (*Id.* at 2.)

## LEGAL STANDARD

The defendant has the ultimate burden of proof on a Fourth Amendment motion to suppress. *United States v. Caymen*, 404 F.3d 1196, 1199 (9th Cir. 2005). The Government has the burden of providing "specific, articulable facts which, together with objective and reasonable inferences, form a basis for suspecting that a particular person is engaged in criminal conduct" to justify reasonable suspicion. *United States v. Thomas*, 211 F.3d 1186, 1189 (9th Cir. 2000); *Terry v. Ohio*, 392 U.S. 1, 21 (1968).

## ANALYSIS

**I. Officer Leshinski performed a valid *Terry* stop that elevated to a lawful seizure and arrest.**

The Fourth Amendment safeguards the right of people from unreasonable searches and seizures. U.S. Const. amend. IV. An officer may, consistent with the Fourth Amendment, perform a brief investigative stop of a person without a warrant when the officer has "a reasonable articulable suspicion that criminal activity is afoot." *Terry v. Ohio*, 392 U.S. 1, 20 (1968); *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000). Officers may ask questions during a *Terry* stop to try to obtain information confirming or dispelling the officer's suspicions. *Berkemer v. McCarty*, 468 U.S. 420, 439 (1984). *Terry* stops can elevate into lawful seizures if reasonable suspicion exists that a crime has been committed. *Arizona v. Johnson*, 555 U.S. 323, 332 (2009).

A court assesses the totality of the circumstances surrounding the stop to determine whether an officer possessed reasonable suspicion. *United States v. Sokolow*, 490 U.S. 1, 8 (1989). A court assesses the totality of circumstances objectively and disregards an officer's subjectivity. *United States v. Willis*, 431 F.3d 709, 716 (9th Cir. 2005). The U.S. Supreme Court has required suspicion only of "criminal activity," not necessarily a specific crime to support a *Terry* stop. *United States v. Arvizu*, 534 U.S. 266, 277 (2002); *see also United States v. Pack*, 612 F.3d 341, 356 (5th Cir. 2010).

An officer may deduct reasonable inferences from and about the cumulative information available at the time based on their own "experience and specialized

7

training." *United States v. Arvizu*, 534 U.S. 266, 273 (2002). Officers can base their inferences on information provided to them if the information conforms to the officer's specialized knowledge of a pattern of criminal activity and to the location where that activity had been occurring. *Nelson*, 284 F.3d at 482.

Officer Leshinski initiated an investigative stop based on the totality of the circumstances and the objective information that he knew at the time when Officer Leshinski approached Madarassy's car. Officer Leshinski knew that a "lifted dark colored car", resembling a Subaru, had been involved in a potential assault with a weapon on December 23,2024. Officer Leshinski had information from the report that Officer Gibson took from PJL and the still photo that Officer Gibson shared to the Helena Police Department. Madarassy argues that PJL's paranoia render it unreasonable for Officer Gibson to rely on the report from PJL and, in turn, for Officer Leshinski to rely on Officer Gibson's report.

Officer Gibson testified, and the body cam footage shows, that Officer Gibson's interview with PJL would not cause an officer with similar experience and training to question the validity of the assault claim. Officer Gibson further corroborated the assault claim by collecting more information, including observing nearby security camera footage from the Federal Reserve, and making contact with the suspect car. An officer's inquiry into a suspected crime continues until the factual circumstances are either uncorroborated or no evidence remains to seek. An officer

8

must be able to able to "articulate something more than an inchoate and unparticularized suspicion or 'hunch.'" *Sokolow*, 490 U.S. 1, 8.

Madarassy relies on *Florida* to argue that an informant's credibility and reputation can be scrutinized more readily by police when police rely on a known informant to investigate a crime. In *Florida*, officers received an anonymous tip from an anonymous caller that provided "no predictive information" about a potential crime or conduct that would have allowed the police to then corroborate the credibility of the information. *Florida. v. J.L.*, 529 U.S. 266, 271 (2000). The U.S. Supreme Court concluded that a tip must be "reliable in its assertion of illegality, not just in its tendency to identify a determinate person." *Id*. at 272. The anonymous caller in *Florida* simply called and provided a description of a person with a particular shirt who was carrying a gun. *Id*. at 271.

Unlike *Florida*, PJL was not anonymous. PJL identified a car similar to Madarassy's Subaru and the driver being the person who pointed a gun at him. Officer Gibson received further confirmation regarding the validity of PJL's claim by reviewing the Federal Reserve security camera footage and by making contact with the car. Officer Gibson put the Helena Police Department on notice of the suspected crime to further the investigation and identify the driver.

The U.S. Supreme Court has determined that an unverified tip, with a low degree of reliability, requires more information to reach the level of reasonable

9

suspicion to find and stop the suspect. *Alabama v. White*, 496 U.S. 325, 330 (1990). In *Brown*, an employee of a YWCA called 911 after a resident reported "seeing someone with a gun." *United States v. Brown*, 925 F.3d 1150, 1152 (9th Cir. 2019). The employee had received a report second hand through a resident that a black man had a gun. *Id*. Police responded to the call and chased Brown, who was on foot, eventually holding him at gun point and arresting him. *Id*. The Ninth Circuit determined that the 911 call and the report of a man having a gun did not qualify as a reliable tip, reported no criminal activity, and reported no threat of harm. *Id*. Based on 911 call's vagueness of reporting any actual crime and Brown's flight, the police lacked the requisite reasonable suspicion to stop Brown pursuant to *Terry*.

The HPD officers possessed more information than the police in *Brown*. PJL's description of the car, Madarassy's physical features, and gun being pointed at him went beyond just reporting a person with a gun on the street. If PJL had described Madarassy simply having a gun and described his physical features, the police would have required more information to determine if a crime had been committed. The fact that PJL reported the driver of a vehicle pointed a gun at him gave the officer's reason to investigate the alleged conduct further.

Officer Leshinski knew that Officer Gibson had located the suspected car on December 24, 2024, but had not located the driver. The HPD officers still had reason to make contact with the driver. The HPD officers met the requisite level of

10

reasonable suspicion that a crime had potentially been committed when they found a car with a driver matching Madarassy's description and Madarassy confirming the encounter with PJL.

Officer Leshinski made contact with Madarassy to ask about the nature of the encounter. Madarassy exhibited no signs of impairment or any driving behavior that suggested that he was impaired. Officer Leshinski acted based on his objective belief that Madarassy had been involved in crime after Madarassy admitted to the encounter and matched the previous descriptions. The temporary seizure of Madarassy at this point proves reasonable. *Id.* at 331. Based on the totality of circumstances and the reliability of information that Officer Gibson, Officer Leshinski, and Strandberg observed and investigated the eventual search of Madarassy's car was reasonable and the evidence seized should not be suppressed. *Alabama v. White*, 496 U.S. 325, 330(1990).

## II.   P & P gave lawful consent to search Madarassy's car and based its consent on reasonable suspicion a crime had been committed.

People on probation enjoy "only a conditional liberty properly dependent on observance of special probation restrictions." *United States v. Mayer*, 560 F.3d 948, 956 (9th Cir. 2009). Probation officers may consent to a search of a probationer or his property without a warrant based on reasonable suspicion that a probation violation has occurred. *Id.*

Based on the facts described above, the HPD officers adequately described the alleged crime and conduct by Madarassy to allow the Bozeman P & P officer to reasonably conclude that a crime had been committed, in violation of Madarassy's probation conditions. The Bozeman P & P reasonably believed that Madarassy had violated the condition that he "must not possess a firearm, destructive device, or other weapon" based on the recounting of events by the HPD. The Bozeman P & P officer provided valid consent to search Madarassy's car. Madarassy also had violated the condition that he report to the P & P officer via telephone every week, and had failed to check-in for several weeks. (Govt. Ex. 5.) For the above reasons Madarassy's motion to suppress should be denied and the evidence seized should not be suppressed.

Accordingly, **IT IS HEREBY ORDERED** that Madarassy's Motion to Suppress (Doc. 28.) is **DENIED.**

DATED this 3rd day of October, 2024.

_____
Brian Morris, Chief District Judge
United States District Court